Brian J. Neville (BN 8251)
Barry R. Lax (BL 1302)
Brian Maddox (BM 6128)
LAX & NEVILLE, LLP
1412 Broadway, Suite 1407
New York, NY 10018
Tel: (212) 696-1999
Fax: (212) 566-4531

*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

               Debtor.

------------------------------------------------------------

Mary Albanese, Brow Family Partnership,
Allan Goldstein, Laurence Kaye,
Suzanne Kaye, Rose Less, on behalf
of themselves and all Others Similarly
Situated,

               Plaintiffs,

  vs.

IRVING H. PICARD, as Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

               Defendant.

------------------------------------------------------------x

SIPA LIQUIDATION

No. 08-01789 (BRL)

Adv. Pro. No. _____ (BRL)

**CLASS ACTION COMPLAINT**
**FOR DECLARATORY JUDGMENT**

Plaintiffs Mary Albanese, the Brow Family Partnership, Allan Goldstein, Laurence Kaye, Suzanne Kaye and Rose Less ("Plaintiffs"), on behalf of themselves and the Class (defined below), through their undersigned counsel, state as follows:

## NATURE OF PROCEEDING

1. This adversary proceeding class action arises from the liquidation of Bernard L. Madoff Investment Securities LLC ("Madoff") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA"), in the United States Bankruptcy Court for the Southern District of New York (the "Court"). Plaintiffs, each of whom held at least one customer account with Madoff, seek a declaratory judgment as to the proper method of calculating the amount of their claims against Madoff.

2. Plaintiffs have filed claims totaling over $9 million in "net equity," which is the total market value of the securities reflected in Plaintiffs' November 30, 2008 statements from Madoff, less any amounts owed.

3. The trustee for the Madoff liquidation, Irving H. Picard (the "Trustee"), has repeatedly taken the position at public meetings, in press releases and claim determination letters that a customer's "net equity" equals his deposits to his Madoff account minus withdrawals, without any credit for the value of securities appearing on the customer's account statement. The Trustee's position contradicts the plain language of SIPA, its legislative history, and the position that the Securities Investor Protection Corporation ("SIPC") has itself taken in a similar case in this Circuit.

4. Plaintiffs, on behalf of themselves and the Class, have commenced this action to obtain a declaratory judgment, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, (i) that the Trustee's definition of net equity is incorrect as a matter of law, and (ii) that a customer's "net equity" under SIPA is the value of the securities reflected in the customer's Madoff account as of the SIPA filing date (even where the securities were never actually purchased) less any amounts the customer owes to Madoff.

## JURISDICTION AND VENUE

5. This action is brought as an adversary class action proceeding, pursuant to Rules 7001(1), (9) and 7023 of the Federal Rules of Bankruptcy Procedure, and Rule 23 of the Federal Rules of Civil Procedure, in the Court in which the main underlying SIPA liquidation proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending. The SIPA Proceeding was originally brought by the SIPC in the U.S. District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791.

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d)(2)(A), 1334(b) and 2201.

7. The Court has personal jurisdiction over the Trustee pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

8. This adversary proceeding class action is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B) and (O).

9. Venue is proper in this district pursuant to 28 U.S.C. §§ 1409 and 1391(b).

## PARTIES

10. Plaintiff Mary Albanese is 73 years old and currently resides in New Jersey. In 1993, Ms. Albanese opened the Mary Albanese IRA Account at Madoff with account number 1-ZR260.

11. Ms. Albanese is the wife of deceased Dominick Albanese and trustee for the Dominick Albanese Trust Account B. In 1993, Dominick Albanese opened the Dominick Albanese Trust Account B at Madoff with account number 1-A-0101.

12. Plaintiff the Brow Family Partnership is a partnership organized under Florida law. The Brow Family Partnership opened the Brow Family Partnership account at Madoff in 1992 with account number I-ZA482.

13. Plaintiff Allan Goldstein is 76 years old and currently resides in California. In 1997, Mr. Goldstein opened the Allan Goldstein IRA Account at Madoff with account number 1-CM450.

14. Plaintiffs Laurence and Suzanne Kaye, both 66 years old, are married and reside in California. In 1998, Mr. Kaye opened the Laurence Kaye IRA Account at Madoff with account number 1-K0142. In 1990, the Kayes opened the Laurence Kaye Susan Kaye Trustees account at Madoff with account number 1-K0122.

15. Plaintiff Rose Less is 88 years old and resides in New York. In 1993, Mrs. Less opened the Rose Less Account at Madoff with account number 1-ZB293.

16. Defendant is the Trustee appointed to administer the liquidation of Madoff under SIPA pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

17. Plaintiffs bring this action as a class pursuant to Rule 7023(a) and (b)(2) of the Federal Rules of Bankruptcy Procedure, and Rule 23 of the Federal Rules of Civil Procedure, on behalf of all those persons who were investors in Bernard L. Madoff Investment Securities LLC during the Class Period (from inception until December 11, 2008), who are adversely affected by the Trustee's definition of "net equity" under SIPA, and who have suffered and will suffer damages thereby. Excluded from the Class are the (i) Trustee, members of his immediate family and their legal representatives, heirs, successors, or assigns and any entity in which Defendant

has or had a controlling interest; and (ii) Bernard L. Madoff, members of his immediate family and their legal representatives, heirs, successors, or assigns and any entity in which Bernard L. Madoff has or had a controlling interest, including their officers, directors, agents and employees.

18. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are approximately in excess of 3,000 members in the proposed Class. Members of the Class may be identified from records maintained by the Defendant or Bernard L. Madoff Investment Securities LLC and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19. Plaintiffs' claims are typical of the claims of the members of the Class—as all members of the Class are similarly affected by Defendant's incorrect definition of "net equity," which should be a defined under SIPA as the value of the securities reflected in the customer's Madoff account as of the SIPA filing date (even where the securities were never actually purchased) less any amounts the customer owes to Madoff.

20. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class, SIPA, broker/dealer and bankruptcy litigation.

21. The Defendant opposing the Class has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

22. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, the damages suffered by individual class members varies and in some instances may not justify the expense and burden of separate litigation on behalf of the individuals. The logistics and management of this action will not be difficult.

## FACTUAL ALLEGATIONS

### A. Background

23. Each of the following Plaintiffs in this action held at least one customer account with Madoff as of December 11, 2008, when Bernard Madoff was arrested for operating a massive Ponzi scheme.

#### (i) *Mary Albanese*

24. Plaintiff Mary Albanese opened the Mary Albanese IRA Account at Madoff in 1993. Ms. Albanese has been a widow since her husband, Dominick, passed away in 1995. Because Ms. Albanese relied entirely upon her husband to handle their finances, Ms. Albanese does not know exactly how much money in total was deposited in or withdrawn from her Madoff account, and she does not possess records going back to 1993. Upon information and belief, the total amount withdrawn from the Mary Albanese IRA Account since 1993 exceeded the total amount deposited.

25. Ms. Albanese is the trustee for the Dominick Albanese Trust Account B, which her husband opened with Madoff in or around 1993. Ms. Albanese was not involved in opening the Dominick Albanese Trust Account B and she does not know, nor does she possess records showing, how much was in total deposited in or withdrawn from that account since 1993. Upon

6

information and belief, the total amount withdrawn from the Dominick Albanese Trust Account B since 1993 exceeded the total amount deposited.

26. Following the death of her husband, Ms. Albanese sought to downsize her expenses by selling the family home and purchasing a smaller townhouse. In early 2006, in an effort to downsize even further and due to her age, Ms. Albanese sold the townhouse and purchased a small condominium in a retirement community. In 2006, Ms. Albanese deposited $360,000 from the sale of the townhouse into the Dominick Albanese Trust Account B.

27. Ms. Albanese has withdrawn funds from the Madoff accounts for mortgage and tax payments and for necessary living and medical expenses. Ms. Albanese also took statutorily required minimum distributions from her IRA account. In 2006, Ms. Albanese withdrew $165,000 from the Dominick Albanese Trust Account B to purchase the condominium.

28. At the end of each month, the Albaneses would receive written account statements from Madoff indicating the purchases and sales of securities during that month, and listing each of the open securities positions held in the accounts. The securities listed on these statements were real, widely held securities and their prices could be readily verified against objective and publicly available market information. As of November 2008, the last month for which Ms. Albanese received Madoff statements, the balance of the Mary Albanese IRA Account was $858,065.72, and the balance of the Dominick Albanese Trust Account B was $480,177.65.

29. Other than social security benefits, the Madoff accounts were Ms. Albanese's only source of income. As a result, Ms. Albanese is presently struggling to pay for basic living and medical expenses and has had to resume work after retirement by obtaining part-time employment with Macy's department store. Ms. Albanese's bank accounts are nearly depleted

and her social security payments and part-time wages will not be enough to pay for mortgage payments or long-term care insurance.

30.     On February 9, 2009, pursuant to this Court's order dated December 23, 2008 (the "Bar Date Order"), Ms. Albanese filed two SIPC claims with the Trustee for the balance showing on the November 30, 2008 Madoff statements. The SIPC claim for her IRA account is for $858,065.72, and the SIPC claim for her deceased husband's trust account is for $480,177.65. Ms. Albanese has not yet received any determination letters from the Trustee.

### (ii)    *Brow Family Partnership*

31.    The members of the Brow Family Partnership joined together to open a partnership account with Madoff in 1992. Together, the partners initially deposited $545,000 in their partnership Madoff account and made additional principal contributions throughout the years. The Brow Family Partnership withdrew profits on a quarterly basis from the Madoff Securities account, which were distributed according to each partner's percentage of the total amount invested by each partner. The distributions from their accounts with Madoff were used by the partners for mortgage and tax payments and for living, medical and college expenses. Upon information and belief, the total amount withdrawn from the account since 1992 exceeded the total amount deposited.

32.    At the end of each month, the Brow Family Partnership would receive a written account statement from Madoff indicating the purchases and sales of securities during that month, and listing each of the open securities positions held in the account. The securities listed on these statements were real, widely held securities and their prices could be readily verified against objective and publicly available market information. As of November 2008, the last

month for which the Brow Family Partnership received Madoff statements, the balance of the account was $830,753.18.

33. As a result of the Madoff fraud, the partners of the Brow Family Partnership are suffering extreme hardship:

- Mildred Wang is 87 years old widow, and lives alone in a modest condominium in rural New Jersey. Ms. Wang has been a widow since her husband passed away in 1999. Ms. Wang has had open heart surgery and has trouble with her eyes. She was also diagnosed with breast cancer and was treated with radiation. Ms. Wang suffers from dangerously high blood pressure condition which developed from the stress caused by the Madoff fraud. The stress-related blood pressure situation has also caused bleeding behind her retinas. Currently, without the Madoff distributions, Ms. Wang's necessary living and medical expenses are significantly more than her current sources of income derived from social security benefits, a small savings account and approximately $900/month received from an annuity and money market fund. These small savings will soon be depleted and her social security benefits will not be sufficient to pay for her expenses. Because of her poor health and age, Ms. Wang is unable to resume work.

- Audrey and Robert Orenbach are 84 and 86 years old, respectively, and have been married for 54 years. They are in very poor health, and their only current source of income is social security benefits. Mr. Orenbach has been hospitalized three times since the Madoff fraud unfolded, due to chest pains caused by stress, and is now on oxygen full time. He is bent over at the waist, walks with a cane, and cannot work. The Orenbachs have an adult, emotionally-disabled daughter living at home whom they also support. Since the Madoff fraud, the Orenbach's bank accounts have been depleted, and are now unable to pay for their necessary

living and medical expenses. Indeed, they have been forced to receive financial assistance from their friends and family to pay for their expenses. They have applied for food stamps, but were denied because they receive social security income. Because of their poor health and ages, the Orenbachs are unable to resume work after retirement.

- Ira and Shelly Roth are married and are 62 and 54 years old, respectively. Mr. Roth is a retired NYC school teacher and Mrs. Roth is a special education teacher. Mr. Roth has been battling illness this past year and cannot return to work. The Roths have three children, Evan, Alexander and Jordan, ages 21, 19 and 18, respectively. Evan and Alexander are in college, and Jordan will begin college this fall. The Roths took out a $100,000 home equity loan to invest in their Madoff account with the idea that the difference in the respective interest rates would help them pay for their sons' college tuitions. As a result of the Madoff fraud, the Roths cannot afford to pay their sons' tuitions and are in debt for the $100,000. The Roths live on Mrs. Roth's salary and Mr. Roth's pension. They at all times intended to use the Madoff account to provide a significant amount of their retirement funding.

34. As of June 5, 2009, the Brow Family Partnership has not filed a SIPC claim with the Trustee for $830,753.18, which is the balance reflected on the November 30, 2008 Madoff statement. The Brow Family Partnership will be similarly adversely affected by Defendant's incorrect definition of "net equity."

(iii) *Allan Goldstein*

35. Plaintiff Allan Goldstein opened an IRA account with Madoff in 1997. Upon information and belief, Mr. Goldstein made deposits into the account totaling approximately $2.2 million. Mr. Goldstein took withdrawals from the account to pay for necessary living and medical expenses, and to pay state and federal taxes. He also withdrew statutorily required

minimum distributions for IRA accounts starting in 2005. Upon information and belief, Mr. Goldstein's total withdrawals from his IRA account exceeded his total deposits.

36. At the end of each month, Mr. Goldstein would receive a written account statement from Madoff indicating the purchases and sales of securities during that month, and listing each of the open securities positions held in the account. The securities listed on these statements were real, widely held securities and their prices could be readily verified against objective and publicly available market information. As of November 2008, the last month for which Mr. Goldstein received Madoff statements, the balance of his IRA account was $4,250,725.14.

37. The funds in Mr. Goldstein's account were his only source of retirement income. As a result of the Madoff fraud, Mr. Goldstein and his wife were forced to sell their home and move in with their daughter in California. Their bank accounts are depleted and their only current source of income is social security benefits. The Goldsteins are unable to pay for basic living and medical expenses and have been forced to receive financial assistance from their daughter. Because of their age, the Goldsteins are unable to resume work after retirement.

38. On March 26, 2009, pursuant to Bar Date Order, Mr. Goldstein filed a SIPC claim with the Trustee for $4,250,725.14, which is the balance reflected on the November 30, 2008 Madoff statement. Mr. Goldstein has not received a determination letter from the Trustee.

**(iv)** *Laurence and Suzanne Kaye*

39. Plaintiff Laurence Kaye opened a Roth IRA account at Madoff in 1998. Mr. Kaye deposited $147,876.60 to his Madoff account in 1998 and did not make any additional deposits to the account. Mr. Kaye did not withdraw any funds from his account.

40. Mr. Kay and his wife, Suzanne Kaye, are both 66 years old. They opened a living trust account with Madoff in 1990. The Kayes withdrew funds from their Madoff trust account for mortgage and tax payments and for necessary living and medical expenses. The Kayes initially contributed $218,400 to the trust account, and made 12 additional contributions to the account totaling $1,353,000 between April 1993 and September 2008. Withdrawals were made in the amount of $921,000 during 2003 through 2008. Upon information and belief, the total amount withdrawn from the Kaye's trust account exceeded the total amount deposited.

41. At the end of each month, the Kayes would receive written account statements from Madoff indicating the purchases and sales of securities during that month, and listing each of the open securities positions held in the accounts. The securities listed on these statements were real, widely held securities and their prices could be readily verified against objective and publicly available market information. As of November 2008, the last month for which the Kayes received Madoff statements, the balance of Mr. Kaye's IRA account was $531,692.94 and the balance in their trust account was $1,284,610.08.

42. As a result of Madoff fraud, the Kayes cannot afford to make their mortgage payments and will soon be forced to sell their home if their SIPC claim is not approved. Their current source of income is social security benefits and a small pension.

43. On April 2, 2009, pursuant to Bar Date Order, Mr. Kaye filed a SIPC claim for his IRA account with the Trustee for $531,692.94, which is the balance reflected on the November 30, 2008 Madoff statement for that account. On May 27, 2009, the Kayes filed a SIPC claim for their trust account with the Trustee for $1,284,610.08, which is the balance reflected on the November 30, 2008 Madoff statement for that account. The Kayes have not received any determination letters from the Trustee.

**(v)    *Rose Less***

44. Plaintiff Rose Less opened an account with Madoff in around 1993. Mrs. Less does not know exactly how much money in total was deposited in or withdrawn from her Madoff account, and she does not possess records going back to 1993. Upon information and belief, the total amount withdrawn from Mrs. Less's account since 1993 exceeded the total amount deposited.

45. At the end of each month, Mrs. Less would receive a written account statement from Madoff indicating the purchases and sales of securities during that month, and listing each of the open securities positions held in the accounts. The securities listed on these statements were real, widely held securities and their prices could be readily verified against objective and publicly available market information. As of November 2008, the last month for which Mrs. Less received Madoff statements, the balance of her account was $797,352.89.

46. Mrs. Less is 88 years old and is married to Jack, who is 91. The Lesses have been married for 69 years and live in a rent stabilized apartment in New York City. Mrs. Less suffers from fish polio syndrome and Jack suffers from heart failure. The Lesses do not have any assets, other than their used car. Their bank accounts are depleted and their only current source of income is social security benefits. The funds in Ms. Less's Madoff account were the Lesses' only funds, which were being used to pay basic living and medical expenses. As a result of the Madoff fraud, the Lesses are unable to pay for basic living and medical expenses, and have been forced to receive financial assistance from friends and family. They have numerous household and medical bills which they are reluctant to pay because they need money for food. Because of their ages, the Lesses are unable to resume work after retirement.

47. On February 12, 2009, pursuant to Bar Date Order, Mrs. Less filed a SIPC claim with the Trustee for $797,352.89, which is the balance reflected on the November 30, 2008 Madoff statement for that account. Mrs. Less has not received a determination letter from the Trustee.

### B. The Trustee's Definition of "Net Equity" is Incorrect

48. SIPA requires the Trustee to "satisfy net equity claims of customers" of a failed member institution, like Madoff. 15 U.S.C. § 78fff(a)(1)(A)-(B). Accordingly, this Court's Bar Date Order provides that a claim in the Madoff liquidation will be satisfied on the basis of his or her "'net equity' . . . as defined in 15 U.S.C. § 78*lll*(11)." (*See* Bar Date Order at 5.)

49. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, minus any amount the customer owes the debtor. Specifically:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .
>
> 15 U.S.C. § 78*lll*(11)

50. Consistent with this definition of "net equity," Plaintiffs have filed claims for approximately $9 million, which is the "sum which would have been owed" to Plaintiffs if the securities positions reflected in their November 2008 statement had been liquidated, minus any amounts owed to Madoff.[1]

---

[1] The November 30, 2008 statements are the best available proxy for Plaintiffs' securities positions as of the SIPA filing date of December 11, 2008.

14

51. Despite the unambiguous language of SIPA, the Trustee has repeatedly taken the position that a customer's "net equity" is the total amount the customer deposited in his Madoff account minus the total amount withdrawn. At the Madoff creditors meeting on February 20, 2009, for instance, the Trustee stated several times that he would determine a customer's "net equity" by his overall deposits minus withdrawals. The Trustee explained that "for claims purposes, the November 30 statement that said you have various securities is not what we are going to rely on. This is going to be a case in which we're going to be looking at cash in and cash out."[2]

52. Upon information and belief, the Trustee has issued several determination letters to customers in which he has limited (or denied) customer claims based on his calculation of deposits minus withdrawals, without regard to the value of the securities reflected in the customer's account statements.

53. The Trustee's "cash in/cash out" approach is incorrect for several reasons. First, the Trustee's methodology contradicts the plain language of SIPA, which requires a customer's "net equity" to be calculated by taking the value of the "securities positions" reflected in the customer's account on the SIPA filing date, minus any amounts owed to the debtor. *See* 15 U.S.C. § 78*lll*(11). By contrast, the Trustee's "cash in/cash out" approach disregards the customer's monthly statements entirely, and improperly deprives the customer of all appreciation in his portfolio as of the SIPA filing date.

54. Second, to the extent that the Trustee's position is based on his contention that no securities were actually purchased by Madoff, this has no bearing on a customer's "net equity" where the customer regularly received written confirmations and account statements showing

---

[2] Video footage of the creditors meeting is available at http://www.madofftrustee.com/CreditorsMeetings.aspx. The quoted statement is from Status Report, clip 3 of 4 at 5:54 – 6:20.

positions in real securities with verifiable values. As the legislative history of SIPA makes clear, SIPA is intended to protect a customer's legitimate expectations of what the broker held in his account – even if the broker never purchased any securities in the first place.[3] Based on the regular monthly statements, Plaintiffs believed and expected that Madoff executed such transactions and that their account actually held such securities.

55. Third, the Trustee's approach is directly contrary to the position taken by SIPC in *New Times Securities Services, Inc.*, Case No. 800-8178-511 (E.D.N.Y. 2004). The *New Times* case involved a Ponzi scheme in which some customers were told they were invested in entirely fictitious money market funds, while other investors believed they were invested in real money market funds (but, in fact, such investments were never made). The SIPC trustee determined that the "net equity" of the investors in the real money market funds was the value of their investments as reflected in their account statements, even though the investments were never made. When the investors in the fictitious money market funds sought similar treatment, the Second Circuit Court of Appeals described the distinction between the two groups as follows:

> Meanwhile, investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably [by SIPC]. Although they were not actually invested in those real funds – because Goren never executed the transactions – the information that these claimants received on their account statements 'mirrored what would have happened had the given transaction been executed.' [Br. for New Times Trustee and SIPC] at 7 n.6. As a result, the Trustee deemed those customers' claims to be 'securities claims' eligible to receive up to $500,000 in SIPC advances. *Id.* The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. *Id.* Furthermore, the Trustee notes that, if they were checking on their mutual funds, the 'securities claimants,' in contrast to the 'cash claimants' bringing this appeal,

---

[3] *See* H.R. Rep. No. 95-746, at 21 ("A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.") (emphasis added).

16

could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements. *Id.*

*In re New Times Sec. Services, Inc.*, 371 F.3d 68, 74 (2d Cir. 2004).

56. Thus, even SIPC has previously acknowledged that when an investor receives account statements reflecting positions in real securities at verifiable prices, he is entitled to a "net equity" claim in the full amount of the value of those securities positions, even if the securities were never purchased. In this proceeding, Plaintiffs' "net equity" claims should similarly be calculated as the value of securities reflected in their final Madoff statements (minus any amounts owed to Madoff), and not by the Trustee's "cash in/cash out" approach.

C. **The Trustee's Approach to "Net Equity" Has Prejudiced Plaintiffs and Other Investors**

57. Under the proper interpretation of "net equity," the determination of claims in the Madoff liquidation should be a relatively simple exercise of subtracting from an investor's last account balance any margin or other amounts owed by the investor to Madoff. Instead, the Trustee has engaged in a complex, time-consuming and wholly unnecessary analysis of deposits and withdrawals in each account, many of which were opened decades ago. As a result, the Trustee has failed to determine and pay claims properly.

58. Upon information and belief, using the Trustee's cash in/cash out approach will result in each Plaintiff either receiving no SIPC funds at all, or receiving far less than what is on their final Madoff statements – even though the statements showed positions in real securities at verifiable prices, which Plaintiffs relied on and reasonably believed were truthful. If the Trustee's approach is permitted by the Court, Plaintiffs – who are already victims of the most massive Ponzi scheme in history and are now struggling to pay basic living expenses – will be victimized again through the unfair determination of their SIPC claims.

59. Upon information and belief, the Trustee's approach has already prejudiced numerous other Madoff victims whose SIPC claims have been either denied or substantially limited based on the cash in/cash out approach. Furthermore, the Trustee's approach has prejudiced those other Madoff customers who, upon information and belief, have decided not to file claims because of the Trustee's publicly stated position on how a customer's "net equity" will be determined.

## CLAIM FOR RELIEF

### (For Declaratory Judgment, Pursuant to 28 U.S.C. § 2201)

60. Plaintiffs incorporate by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. determining that this action is a proper class action and certifying Plaintiffs as Class Representative under Rule 7023 of the Federal Rules of Bankruptcy Procedure, and Plaintiffs' counsel as Lead Counsel;

B. determining that all members of the Class be deemed to have filed a SIPC Customer Claim Form as of the filing of this Complaint;

C. determining, pursuant to 28 U.S.C. § 2201, that (i) the Trustee's definition of "net equity" as deposits minus withdrawals is incorrect as a matter of law, and (ii) that a customer's "net equity" under SIPA is the value of the securities positions reflected in that customer's Madoff account(s) as of the SIPA filing date (even where securities were never actually purchased) less any amounts the customer owes to Madoff;

D. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. such other and further relief as the Court may deem just and proper.

Dated: New York, New York
June 5, 2009

Respectfully submitted,

LAX & NEVILLE, LLP

By. _____
Brian J. Neville (BN 8251)
Barry R. Lax (BL 1302)
Brian Maddox (BM 6128)
1412 Broadway, Suite 1407
New York, NY 10018
Tel: (212) 696-1999
Fax: (212) 566-4531
Attorneys for Plaintiffs